## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Nathan Christopher Braun, | Case No. 18-cv-3355 (JNE/ECW) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Dennis Hanson, *et al.*, | |
| Defendants. | |

This case is before the Court on a Motion for Summary Judgment ("Motion") (Dkt. 104) brought by Defendants Dennis Hanson, Justin DeMars, Christopher Mitchell, Anthony Sunde, Scott Eitel, Michael Gephart, Eric Meemkin, Lisa Meyer, Benjamin Sutlief, Steve Kriha, Carolyn Skrypek, Fergus Gavin, and Kathy Halvorson (hereinafter together as "Defendants"). The case has been referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

Plaintiff Nathan Braun ("Braun") is an inmate of the Minnesota Department of Corrections ("DOC") who brings this Section 1983 civil rights action against Defendants for issues relating to a cell transfer, claiming excessive force and deliberate indifference to medical needs. (Dkt. 9.) Defendants seek summary judgment, claiming that they did not use excessive force and were not deliberately indifferent to Braun's medical needs, or alternatively on grounds of qualified immunity. For the reasons stated below, the Court recommends the Motion be granted.

# I.    PROCEDURAL BACKGROUND

According to the Second Amended Complaint, on February 5, 2018, Braun notified Defendants Steve Kriha and Carolyn Skrypek that he was beginning a hunger strike. (Dkt. 9 ¶ A.) Braun also provided written notice of his hunger strike to Defendant Kathy Halverson. (*Id.*) Braun would not eat or drink until prison officials held a press conference to "admit[] to the unlawful acts they had been commit[t]ing." (*Id.*)

Braun asserts that in response to his hunger strike declaration, Defendants Dennis Hanson, Justin DeMars, Christopher Mitchell, Anthony Sunde, Scott Eitel, Michael Gephart, Eric Meemken, Lisa Meyer, Benjamin Sutlief, and Fergus Gavin placed him in another cell where he was "deprived of all legal mail/materials and denied access to shower." (*Id.* ¶ B.) Braun was "completely compliant" while being moved to that new cell, but the ten defendants moving him:

> dislocated [Braun's] shoulder, administered chemical deter[r]ant twice, pushed [Braun] down a flight of stairs, broke bones in [Braun's] wrist that has caused continued nerve damage, caused a dis[c] in the lumbar region of [Braun's] spine to hern[i]ate causing sciatica, cut [Braun's] face to the point of bleeding, then us[ed] restraints to purposefully cause physical pain.

(*Id.* ¶ C.)

Braun asserts that Defendants then denied him healthcare services and "lied to nursing staff as to [Braun's] injuries to [his] body that required medical attention." (*Id.* ¶ D.) Braun was left in a cell with "inadequate" heating and clothing, access to water was shut off, and Braun was refused a shower. (*Id.* ¶ E.) Braun also asserts prison healthcare services were never notified of Braun's "hunger strike and starved and deprived [him] of all food or water for four complete days" before he was transferred to

another prison. (*Id.* ¶ F.) Defendants "falsified reports in order to cover up their unlawful use of force and attempted to kill [Braun] by starvation." (*Id.* ¶ G.) Finally, Defendants refused to give Braun his legal mail, contact legal counsel, speak to his therapist upon request, or speak to CIT. (*Id.* ¶ H.) Braun asserts these acts were all retaliation for his initiation of a hunger strike. (*Id.* ¶ I.)

Braun brought suit against Defendants in their official and personal capacities. (*Id.* at 3.) Braun requests injunctive relief of a trial and immediate placement into administrative segregation to protect him from further retaliation. (*Id.*) Braun also requests that criminal and civil charges be filed against Defendants. (*Id.*) Finally, Braun requests $1.5 million in damages for Defendants' "unlawful use of force, physical and emotional injury . . . , and violation of his constitutional rights." (*Id.*)

Defendants filed a Motion to Dismiss all claims. (Dkt. 28.) On January 24, 2020, this Court issued a Report and Recommendation recommending dismissal of the claims of retaliation, barring access to the courts, and conditions of confinement, but also recommending denial of the motion with regard to the claims of excessive force and deliberate indifference to serious medical needs:

> Braun has failed to plead sufficient factual matter to state a claim for relief as to his access to the courts, conditions of confinement, and retaliation claims. As such, these claims should be dismissed. Braun has successfully pleaded his excessive force and deliberate indifference to serious medical needs claims, and those claims should move forward to discovery. Braun's request for injunctive or prospective relief against Defendants in their individual capacities, request that criminal and civil charges be brought against Defendants, request to be immediately placed in administrative segregation, and request for monetary relief against Defendants in their official capacities all lack legal merit and should be dismissed.

(Dkt. 46 at 18-19.)  The Report and Recommendation was adopted by United States District Judge Joan N. Ericksen.  (Dkt. 52.)

## II.    FACTUAL BACKGROUND

### A.    General Background

On February 5, 2018, Braun was incarcerated at the Minnesota Correctional Facility at St. Cloud ("MCF-St. Cloud").  (Dkt. 106 ¶ 3.)  Braun was transferred from MCF-St. Cloud to Minnesota Correctional Facility at Faribault ("MCF-Faribault") on May 18, 2018, where he remained incarcerated until November 8, 2018, when he was transferred to Minnesota Correctional Facility Oak-Park Heights ("MCF-OPH").  (*Id.*; Dkt. 106-1 at 2.)

### B.    Facts Set Forth in Correctional Officer Incident Reports and Declarations

On November 5, 2020, Braun was housed on the second floor of the segregation unit at MCF-Faribault.  (Dkt. 114 ¶ 3.)  Kriha and Skrypek were handing out meals on the evening of November 5, 2020.  (*Id.*; Dkt. 114-1.)  After Braun was provided with his meal, he tossed it out of the book pass and yelled at Kriha, "It's cold, warm it up you fat piece of shit.  Give me your lunch."  (Dkt. 113 ¶ 3; Dkt. 114 ¶ 3; Dkt. 114-1.)  Braun also yelled at other inmates about the food (Dkt. 113 ¶ 3), while the other inmates "were also yelling about their food being cold" (Dkt. 114-1).

According to Skrypek, Braun did not inform her that he was on hunger strike at any time.  (Dkt. 114 ¶ 4.)  The other Defendants also denied knowledge of Braun's claimed hunger strike.  (Dkt. 107 ¶ 8, Dkt. 110 ¶ 14; Dkt. 113 ¶ 12; Dkt. 115 ¶ 12, Dkt. 116 ¶ 8; Dkt. 117 ¶ 8.)  Similarly, Defendants denied depriving Braun of food and water

at any time.  (Dkt. 107 ¶ 8; Dkt. 110 ¶ 14; Dkt. 113 ¶ 12; Dkt. 115 ¶ 10; Dkt. 116 ¶ 8; Dkt. 117 ¶ 8.)

Because of "the incident on the evening of November 5, 2020, where he threw a tray through the book pass and yelled at a correctional officer", Braun was placed on Quiet Status.  (Dkt. 113 ¶ 3.)  Quiet Status is a status assigned to an offender already in segregation where he is placed in a specific room and subjected to restricted amenities due to destructive, disruptive, threatening, or acting out behaviors.  (*Id.*)

At approximately 8:00 a.m. on November 6, 2020, Mitchell, Gephart, Sunde, Gavin, Eitel, and Hanson arrived to transfer Braun to a cell on the first floor, due to his placement on Quiet Status.  (Dkt. 110 ¶ 4; Dkt. 110-1; Dkt. 111 ¶ 5; Dkt. 113; Dkt. 115-1.)

After the officers arrived, Sunde observed that Braun's book pass was obstructed by a pillow.  (Dkt. 110 at ¶ 5; Dkt. 110-1.)  Sunde removed the pillow and informed Braun that he needed to come to the book pass in order to be handcuffed before transferring to his new cell.  (Dkt. 110 ¶ 5; Dkt. 115 ¶ 4; Dkt. 115-1.)  Braun stated that he wanted to bring his legal work with him but was told by Sunde that he could not, due to his being placed on Quiet Status.  (Dkt. 110 ¶ 5; Dkt. 110-1; Dkt. 115-1.)  Sunde gave Braun either four or five directives to comply and be placed in restrains.  (Dkt. 110 ¶ 5; Dkt. 110-1.)  Rather than comply, Braun yelled, "[C]ome in and get me you fat fuck!" (Dkt. 110 ¶ 5; Dkt. 110-1.)  Sunde warned Braun that if he did not comply, chemical irritant would be used.  (Dkt. 110 ¶ 5; Dkt. 110-1.)  Braun did not comply and used his left arm to attempt to punch and grab Sunde through the book pass.  (Dkt. 110 ¶ 5; Dkt.

5

110-1; Dkt. 113 ¶ 4; Dkt. 113-1, Dkt. 115 ¶ 5; Dkt. 115-1.) Sunde then deployed chemical irritant on Braun with authorization from Mitchell. (Dkt. 110 ¶ 6; Dkt. 113 ¶ 4; Dkt. 115 ¶ 5.)

Guards were able to grab one of Braun's hands through the book pass. (Dkt. 110 ¶ 6; Dkt. 110-1; Dkt. 115 ¶ 6; Dkt. 115-1.) When Braun continued to resist, Sunde again deployed chemical irritant on Braun. (Dkt. 110 ¶ 6; Dkt. 110-1.) Gavin called in an Incident Command System to assist with the transfer. (Dkt. 110 ¶ 6.) While Gavin and Eitel attempted to secure Braun's hands for cuffing, Eitel deployed joint manipulation on one of Braun's hands in order to secure it for handcuffing; however, the joint manipulation "was ineffective and Braun continued to resist." (Dkt. 115 ¶ 6; Dkt. 115-1.) Because Braun "attempted to grab Sunde and Eitel's hands and pull his arms back through the book pass," Mitchell directed Braun to "stop resisting and stop trying to injure our staff." (Dkt. 113-1) Mitchell then took control of Braun's arm and employed joint manipulation on his wrist to secure it. (Dkt. 113 ¶¶ 7-9; Dkt 113-1 at 1.) As Braun stopped trying to pull his arms through the book pass, Mitchell let up on the joint manipulation. (Dkt. 113 ¶ 9; Dkt. 113-1.) Braun was placed in handcuffs. (Dkt. 113 ¶ 9; Dkt. 115 ¶ 6, Dkt. 115-1.)

At this point, the A-Team[1] had arrived, and Meemkin and Demars entered the cell. (Dkt. 115 ¶ 7; Dkt. 115-1; Dkt. 116 ¶¶ 3-4; Dkt. 116-1; Dkt. 117 ¶ 4; Dkt. 117-1.) Meemkin and Demars applied the waist chain, leg irons and spit mask to Braun. (Dkt.

---

[1]    The A-Team is the squad that responds to emergent situations in the facility. (Dkt. 116 ¶ 3.)

115 ¶ 7; Dkt. 115-1; Dkt. 116 ¶ 4; Dkt. 116-1; Dkt. 117 ¶ 4; Dkt. 117-1.) These restraints were applied to ensure officer safety. (Dkt. 111 ¶ 9; Dkt. 115 ¶ 8.) After Braun was secured for transfer, the officers escorted him down the stairs. (Dkt. 111 ¶ 10; Dkt. 113 ¶ 10; Dkt. 115 ¶ 7; Dkt. 115-1; Dkt. 117 ¶ 5; Dkt. 117-1.) While descending the stairs, Braun began to resist officers. (Dkt. 111 ¶ 10; Dkt. 113 ¶ 10; Dkt. 115 ¶ 7; Dkt. 115-1; Dkt. 116 ¶ 5; Dkt. 117 ¶ 5; Dkt. 117-1.) Defendants used a control hold to assist Braun to the ground on the landing in between the flights of stairs. (Dkt. 111 ¶ 10; Dkt. 113 ¶ 10; Dkt. 115 ¶ 7; Dkt. 115-1; Dkt. 116 ¶ 5; Dkt. 117 ¶ 5; Dkt. 117-1.) Braun was directed to stop resisting and complied shortly afterwards. (Dkt. 115 ¶ 7; Dkt. 117 ¶ 5; Dkt. 117-1.)

Braun was then led by Defendants into the cell and placed face-down on the mattress. (Dkt. 110-1; Dkt. 113-1; Dkt. 115-1; Dkt. 116-1; Dkt. 117-1.) The officers then removed Braun's clothing and Sutcliffe performed a search. (Dkt. 110-1; Dkt. 113-1; Dkt. 115-1; Dkt. 117-1.) Upon completion of the search, the officers covered him with a towel. (Dkt. 110-1, Dkt. 113-1; Dkt. 115-1.) Braun was asked if he wanted Health Services, and Braun replied that he did want Health Services. (Dkt. 115-1; Dkt. 117-1.) While waiting for health services, the officers examined Braun's restraints to make sure that they were not too tight. (Dkt. 115 ¶ 8; Dkt. 115-1.) Meyer, a nurse, entered the cell and examined Braun, who told her that he had blood on his face and that he had vomited. (Dkt. 107 ¶ 5; Dkt. 107-1.) However, she did not find any blood or vomit on his face. (Dkt. 107 ¶ 5; Dkt. 107-1, Dkt. 121-1 at 2.) Braun also pointed to his arm and said that it was bleeding, but when the nurse looked at it, she saw no blood. (Dkt. 107 ¶ 5; Dkt. 107-1.) Braun also stated that he "probably dislocated his shoulder." (Dkt. 107 ¶ 5; Dkt. 107-

1; Dkt. 121-1 at 2.) The nurse noted that Braun was moving all four extremities and was speaking clearly. (Dkt. 107-1.) After officers had cleared, the nurse went back to check on Braun, and told Braun that she would put an order in his record for pain medication to be administered to him at the next medication pass, and that he should call Health Services if symptoms arise. (Dkt. 107 ¶ 6; Dkt. 107-1; Dkt. 121-1 at 3.) After Meyer finished her examination, the officers removed Braun's restraints and left the cell. (Dkt. 110-1; Dkt. 113-1; Dkt. 117-1.) Before leaving, Meyer gave Braun instructions on post-exposure instructions for how to remove the chemical irritant. (Dkt. 110 ¶ 9; Dkt. 110-1.)

On November 7, 2020, at approximately 12:00 p.m., Sunde spoke with Braun at Braun's request. (Dkt. 110 ¶ 11.) During their conversation, Sunde informed Braun that he would be kept on Quiet Status for one more day, due to his "attempted staff assault and non compliance with staff directives during his cell transfer the day before." (*Id*.) Braun became agitated and accused Sunde of violating his rights, stating that he "did nothing the day before." (*Id*.) Sunde "told him the conversation was over, and he [Braun] began yelling "Sergeant Sunde is a fat f*** and violating my rights." (*Id*.)

As stated previously, Braun remained at MCF-Faribault until November 8, 2018, when he was transferred to the MCF-OPH. (*See* Dkt. 106 ¶ 3.) From the time of the incident until his transfer, Braun did not request care from health services regarding any alleged injuries he sustained during the incident. (*See* Dkt. 107 ¶ 7.) Indeed, Braun was offered an assessment from a registered nurse on November 7, 2018, but Braun declined. (*Id.*; Dkt. 108.)

Braun also requested to speak with a Crisis Intervention Team ("CIT") member, which is a staff member trained in de-escalation techniques when talking to offenders experiencing a crisis or stressful event.  (Dkt. 110 ¶ 12.)  Sunde informed Braun that he was a CIT member.  (*Id*.)  Braun replied that he wanted to speak with a different CIT member.  (*Id.*)  Sunde informed him that offenders did not get to choose their CIT member and then asked what the request pertained to.  (*Id.*)  As soon as Braun began talking about legal paperwork, Sunde informed him that this was not a proper topic for CIT and walked away.  (*Id.*)  Braun began yelling that his rights were violated.  (*Id*.)  Sunde stated that he "do[es] not recall Braun telling him [Sunde] that he wished to speak with a therapist." (*Id*.)  The other officers involved also do not recall Braun requesting to speak with a therapist.  (Dkt. 107 ¶ 8, Dkt. 113 ¶ 13; Dkt. 115 ¶ 10; Dkt. 116 ¶ 8; Dkt. 117 ¶ 8.)

Once Braun was transferred to MCF-OPH on November 8, 2018, a psychiatric referral was made.  (Dkt. 108.)

## C.    **Evidence Submitted by Braun**

Braun asserts that he declared a hunger strike and passed a note expressing so through the slot in his cell door on November 5, 2018.  (Dkt. 76 at 1-2.)  According to Braun, both Kriha and Skrypeck were aware of the contents of the note; however, after reading the note, Kriha "then returned it to the plaintiff's cell, pushed it through the door and hurriedly retreated," and Braun verbally reiterated his hunger strike.  (*Id.*)  In response to the note, Braun's affidavit alleges, "Defendants had ordered [Braun's] water shut off."  (*Id.* at 3.)  DOC policy requires that once made aware of a hunger strike,

officers contact the watch commander and write an incident report, and that the watch commander contact Health Services. (*Id*., Dkt. 76-1 at 1-2.) Health Services was not notified of Braun's hunger strike. (Dkt. 76 at 3.)

The next day, on November 6, 2020, Sunde ordered Braun to "cuff up" at the book pass to his cell. (*Id*. at 4.) Braun attempted to comply, however he slipped on a packet of butter that Sunde had knocked to the floor, causing him to lurch forward. (*Id*.) Sunde then grabbed Braun's right hand and "pulled it through until his shoulder was flush with the door" and activated the Incident Command System. (*Id.* at 5.) Braun asserts that "the 'squad' had already been upstairs, and that Lt. Mitchell was already upstairs, and was handling a canine, and that staff had attempted to obstruct the windows of the cells in the unit" before Sunde ever called them in. (*Id*.) Sunde then "began to apply chemical irritants to the back of [Braun's] head multiple times, while another staff yelled at me to put my other hand through and even threatened to break my thumb off if I didn't." (*Id.*) Braun explained to the officers that he was trying to comply with the cuffing instructions but could not do so easily due to the position of the doorjamb and his right arm being flush against it. (*Id*.) Braun managed to place his left hand close to the entrance of the door jam, causing himself pain, only for an officer to then grab his arm and pull it through. (*Id*.) Braun claims that his shoulder was dislocated as a result. (*Id*.)

After being placed in mechanical restraints, a waist chain, a spit-mask, and leg irons, the officers escorted Braun down the stairs. (*Id*.) While descending the stairway, the officer behind Braun pulled on the leg chain and tripped Braun, letting him fall down the stairs to the metal grating landing. (*Id*.) Then, a "300-pound officer" landed directly

on Braun's back, with his hand and elbow on Braun's head. (*Id.* at 5-6.) Braun asserts that injury to Braun's back, wrist and thigh, and a gash on Braun's right cheekbone resulted from his fall and the officer's landing on top of him. (*Id.*).

The officers then took Braun to his new cell and, after removing his clothes and pinning him to a mattress, asked him if he wanted Health Services. (*Id*. at 6.) Braun responded that he wanted Health Services. (*Id*.) Braun also "asked the officer pressing his bodyweight into the ankle irons to please stop doing so, only for him to intentionally torque them more." (*Id*.)

When the nurse arrived, Braun told her that he was bleeding from a cut on his face. (*Id*.) However, the officer holding Braun down lifted Braun's head and "looked directly at the cut and the blood on the mattress and told the nurse and the still running video camera" that "he [Braun] doesn't need any Health Services" and the evaluation ended. (*Id*.) The next day an officer took photographs of Braun. (*Id*.) At no point was Braun "allowed to decontaminate from the chemical irritants" and at no point "was anyone notified of my [Braun's] hunger strike, although it was clear to other staff and inmates that I had been on Hunger Strike since Nov. 5, and hadn't eaten or drank anything until the day I arrived in Oak Park Heights." (*Id*. at 6-7.)

On February 5, 2020 Braun received an x-ray examination. (Dkt. 121 at 4.) The examining physician's findings stated:

> There is slight apex right lumbar scoliotic alignment. I don't see any acute fracture or dislocation by plain film examination. Intervertebral disc space narrowing is seen at the L5-S1 level. Anterior marginal osteophytes are seen at the mid lumbar levels. No definite pars defect is seen in the lower

lumbar spine. The visualized portions of bilateral sacroiliac joints are within normal limits.

(*Id.*)

The examining physician's impressions were that there was "minimal degenerative spondylosis of the lumbar spine"[2] and that there was "no acute fracture or dislocation seen by plain examination." (*Id.*)

### D.    Video Evidence

The video at Exhibit 3-A produced by Defendants shows six officers standing around a cell with two of the officers close to the door. (Dkt. 111-2 at 00:22.) Officers are then seen becoming startled with an arm swinging at them from the book pass. (*Id.* at 00:29-37.) Then one of the officers grabbed Braun's arm when it was again swinging from the book pass. (*Id.* at 00:37-40.) The same officers continued to struggle with Braun. (*Id.* at 00:38-2:30.) Approximately six other officers show up to Braun's cell but were waved back by one of the original officers. (*Id.* at 2:30-52)

The video at Exhibit 3-B is similar to that of Exhibit 3-A, but from a different vantage point. (Dkt. 111-2.) Again, Braun's arm can be seen swinging out at officers though the book pass, and the officers then grabbing one of Braun's arms. (*Id.* at 00:28-37.)[3] Eventually, the cell door is opened and several of the officers are seen going into

---

[2]    "Spondylosis is age-related change of the bones (vertebrae) and discs of the spine. These changes are often called degenerative disc disease and osteoarthritis." *Lumbar Spondylosis*, University of Michigan Health, https://www.uofmhealth.org/health-library/abr8401 (last visited July 14, 2021).

[3]    There is no audio in either video at Exhibits 3-A and 3-B. (*See* Dkt. 111-2.)

the cell. (*Id.* at 3:04-06.) A number of additional officers also arrive on scene, but it was unclear from the video as to what role, if any, they played in the events at issue prior to Braun's removal from his cell. (*Id.* at 4:02-15.) Braun is then seen being escorted out of his cell by three officers, with other officers standing by as he was led down a flight of stairs. (*Id.* at 5:24-40.) The video concludes with several of those officers peering down the steps after Braun exits the camera view and then hanging what appear to be covers on the cell windows. (*Id.* at 5:41-6:50.)

The video at Exhibit 4 is video taken by one of the officers with audio and begins inside of Braun's cell. (Dkt. 111-3.) Braun was seen wearing a spit shield mask being restrained by officers and complaining about having his legal property withheld from him. (*Id.* at 00:01-12.) He was escorted by officers from his cell with three of the officers holding him, with Braun walking on his own power. (*Id.* at 00:12-31.) As the officers were taking Braun down a flight of stairs, an officer shouted, "on the ground" and three to four officers pinned Braun to the landing, claiming that Braun had tried to trip them. (*Id.* at 00:36-1:09.) When asked by one of the officers, "Why are you trying to fight?" Braun responded, "Why are you violating my rights?" (*Id.* at 1:06-09.) Braun was assisted back to his feet and escorted by officers to a new cell. (*Id.* at 1:09-46.) Once inside the cell, Braun Plaintiff was forced to the ground and pinned using the officers' hands, and one officer pinned his shoulder for a short period of time while his clothes were cut off him and a search was performed of his body. (*Id.* at 1:41- 6:19.) Braun was also wearing leg irons and chains during the search. (*Id.*) During this process, one of the officers asked another officer to see if Braun needed medical attention, to

13

which Braun responded that he did need medical attention.  (*Id.* at 5:45-49.)  One of the officers also stated that Braun has said "yes" to needing medical attention.  (*Id.* at 5:49-50.)  Braun was covered up, and officers continued to keep him on the floor on a mattress while they waited for Health Services and told him that they could not take "them" off until Health Services arrived.[4]  (*Id.* at 6:10-12.)  The officers noted that they were going to keep Braun on his side to make it easier for him to breathe as long as he was cooperating.  (*Id.* at 6:12-20.)  There was no struggle while they waited for Health Services.  (*Id.* at 6:20-11:10.)  One officer asked another officer to see if Braun's circulation was good, and the officers holding him down confirmed that it was good.  (*Id.* at 9:24-30.)  One of the officers asked Braun how he was doing, but it is unclear from the audio if he responded.  (*Id.* at 9:38.)  The officer had also checked the restraints before Health Services arrived but only reported marks.  (*Id.* at 10:50-11:11.)  Health Services then arrived and asked Braun if he needed anything, to which Braun responded that he was bleeding from his face because he was thrown to the floor.  (*Id.* at 11:10-33.)  While the officers holding him checked his face and report no blood, Braun claimed he could feel the blood and also complained about scratches, that his wrist was crushed, and that they tried to suffocate him.  (*Id.* at 11:18-41.)  Health Services personnel stated that she did not believe there was a medical emergency so she would clear out of the cell, but that she would stay just in case to watch.  (*Id.* at 11:40-50.)  Braun told her that he was pretty sure that his arm was dislocated, to which the Health Service personnel replied that she

---

[4]      It appears that "them" was a reference to the restraints.

would check on that it a bit. (*Id.* at 11:49-53.) She also told Plaintiff that he was breathing and talking, which was great, and that she was going to step out but stand by. (*Id.* at 11:53-59.) Officers then proceeded to remove his chains and restraints, with his hand restraints being the last item removed through the book slot. (*Id.* at 12:00-14:54.)

## III.     LEGAL STANDARD

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party has the initial responsibility of demonstrating that there is no genuine issue of material fact to be decided. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). For a dispute about a material fact to be "genuine," the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby*, 477 U.S. 248 (1986). In its review of the facts, the Court must consider the evidence in the light most favorable to the party opposing summary judgment. *See Kneibert v. Thomson Newspapers, Mich., Inc.*, 129 F.3d 444, 451 (8th Cir. 1997).

When a motion for summary judgment has been made and supported by the pleadings and affidavits as provided in Rule 56(c), the burden shifts to the party opposing the motion to proffer evidence demonstrating that a trial is required because a disputed issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "To defeat a motion for summary judgment, a party may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial." *Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009) (citing *Anderson*, 477 U.S. at 247-49). "In evaluating

the evidence at the summary judgment stage, we consider only those responses that are supported by admissible evidence." *Duluth News-Tribune v. Mesabi Publ'g Co.,* 84 F.3d 1093, 1098 (8th Cir. 1996); *see also JRT, Inc. v. TCBY Sys., Inc.*, 52 F.3d 734, 737 (8th Cir. 1995) ("[A] successful summary judgment defense requires more than argument or re-allegation; [the party] must demonstrate that at trial it may be able to put on admissible evidence proving its allegations."). Indeed, Rule 56(c) provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated," and a party "may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." *See* Fed. R. Civ. P. 56(c)(2), (4).

When ruling on a motion for summary judgment, the Court is not required to adopt the plaintiff's version of the facts when those facts are "so 'blatantly contradicted by the record . . . that no reasonable jury could believe' them." *Reed v. City of St. Charles, Mo.*, 561 F.3d 788, 790 (8th Cir. 2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). "A plaintiff may not merely point to unsupported self-serving allegations, but must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor' without resort to 'speculation, conjecture, or fantasy.'" *Id.* at 790-91 (citations and internal quotation omitted). When considering a motion for summary judgment, pleadings submitted by *pro se* litigants are held to less stringent standards than formal pleadings drafted by lawyers. *See Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam). Nevertheless, claims of even a *pro se* plaintiff cannot survive a motion for

summary judgment unless the plaintiff has set forth specific facts demonstrating that there is a genuine issue for trial. *See Quam v. Minnehaha Cnty. Jail*, 821 F.2d 522, 522 (8th Cir. 1987) ("Although Quam is entitled to the benefit of a liberal construction of his pleadings because of his pro se status, Federal Rule of Civil Procedure 56 remains applicable to Quam's lawsuit.").

### IV.    ANALYSIS

Defendants' main arguments in support of the Motion are that Braun failed to meet his burden with respect to his excessive force and deliberate indifference claims, and that they are entitled to qualified immunity on these claims. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The Supreme Court has repeatedly emphasized that qualified immunity is an immunity from suit that should be resolved 'at the earliest possible stage in litigation.'" *Johnson v. Moody*, 903 F.3d 766, 772 (8th Cir. 2018) (quoting *Pearson*, 555 U.S. at 231-32).

"To defeat a motion for summary judgment based on qualified immunity, the plaintiff must put forth facts showing that the officer's conduct violated a constitutional right, and that the right was clearly established at the time of the alleged misconduct." *Johnson*, 903 F.3d at 773 (citing *Pearson*, 555 U.S. at 232). "The district court has discretion to decide 'which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'" *Id.*

(quoting *Pearson*, 555 U.S. at 236).

## A.    Excessive Force Claim

"The Constitution, itself, makes no specific reference to 'excessive force.'" *Martin v. Benson*, Case No. 09-cv-195 (DSD/RLE), 2010 WL 2925116, at *6 (D. Minn. June 14, 2010), *R.&R. adopted*, 2010 WL 2925104 (D. Minn. July 21, 2010), *aff'd*, 407 F. App'x 986 (8th Cir. 2011) (per curiam). "However, it is well established that the Constitution prohibits governmental authorities from using excessive force against individuals who are being held in custody." *Martin*, 2010 WL 2925116, at *6. For prisoners, this protection arises under the Eighth Amendment's prohibition against cruel and unusual punishments. *Id.* "'After incarceration, only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment.'" *Jackson v. Gutzmer*, 866 F.3d 969, 974 (8th Cir. 2017) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). Maintaining institutional security and preserving internal order and discipline are essential goals of a prison administration and may require limitation or retraction of the constitutional rights of prisoners. *See Bell v. Wolfish*, 441 U.S. 520, 546 (1979). As such, "whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishment Clause, the core judicial inquiry is whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*,

18

503 U.S. 1, 6-7 (1992) (cleaned up); *see also Santiago v. Blair*, 707 F.3d 984, 990 (8th

Cir. 2013). The Eighth Circuit has found that:

> This inquiry turns on "such factors as the need for the application of force, the relationship between the need and the amount of force that was used, and the extent of injury inflicted," from which "inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur."

*Jackson*, 866 F.3d at 974 (quoting *Whitley*, 475 U.S. at 321). The Eighth Circuit has

concluded that this standard is deferential towards the actions of prison officials:

> This is a highly deferential standard. "It does not insulate from review actions taken in bad faith and for no legitimate purpose, but it requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice." *Whitley*, 475 U.S. at 322, 106 S. Ct. 1078. "Prison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Hudson*, 503 U.S. at 6, 112 S. Ct. 995. Evidence "that prison officials arguably erred in judgment" in deciding to use even deadly force "falls far short of a showing that there was no plausible basis for their belief that this degree of force was necessary." *Whitley*, 475 U.S. at 323, 106 S. Ct. 1078. **If the evidence shows only "a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives the case should not go to the jury."** *Id.* at 322, 106 S. Ct. 1078.

*Jackson*, 866 F.3d at 974-75 (cleaned up) (emphasis added); *see also Whitley*, 475 U.S. at

319 (finding that the infliction of pain in the course of a prison security measure is not

cruel and unusual "simply because it may appear in retrospect that the degree of force

authorized or applied for security purposes was unreasonable, and hence unnecessary in

the strict sense"). Moreover, Braun bears a substantial burden on this issue—"[u]nless it

appears that the evidence, viewed in the light most favorable to the plaintiff, will support

a reliable inference of wantonness in the infliction of pain . . . the case should not go to the jury." *Whitley*, 475 U.S. at 322. "An officer may be held liable only for his or her own use of excessive force." *Jackson v. Gutzmer*, 866 F.3d 969, 974 (8th Cir. 2017). "[T]he subjective motivations of the individual officers are of central importance in deciding whether force [was] used maliciously and sadistically to cause harm in violation of the Eighth Amendment." *Burns v. Eaton*, 752 F.3d 1136, 1139 (8th Cir. 2014) (quotation omitted).

Defendants argue that Braun cannot prove that any Defendant acted with malicious and sadistic intent on November 6, 2018 and that they only used the amount of force necessary to gain Braun's compliance as part of the transfer and to prevent assaults on officers.[5]  (Dkt. 105 at 15-16.)  Braun argues that a dispute of fact exists because of

---

[5]    Defendants also argue that summary judgment is appropriate because Braun's Amended Complaint asserts that the date of the incident at issue is February 5, 2018, while Braun was incarcerated in St. Cloud and not MCF-Faribault.  (Dkt. 105 at 11.)  The pleading requirements set a "low standard" that serves the purpose of "giv[ing] the opposing party fair notice of the nature and basis or grounds for a claim, and a general indication of the type of litigation involved." *N. States Power Co. v. Fed. Transit Admin*., 358 F.3d 1050, 1056-57 (8th Cir. 2004) (quoting *Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707, 714 (8th Cir. 1979)).  The Rules do not "entitle parties to manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment." *Id.* at 1057.  This case, however, is easily distinguishable from *Northern States*, where the plaintiffs had failed to plead the cause of action that they sought to advance at summary judgment, and further failed to plead anything at all that "would have notified the Defendants of this claim." *Id.*  In this case, Defendants had sufficient notice of the claims against them even though Braun may have used an incorrect date.  As such, this is not a basis for dismissal of the remaining claims in the Amended Complaint.

the number of officer teams utilized in his transfer[6]; because of the fact that Defendants did not generate use of force reports or a nurse report; and because records show that he is taking medication for the nerve damage resulting from being thrown down the stairs by Defendants and suffered scarring on his face. (Dkt. 120 at 2.)

Braun does not dispute that he was being transferred from his cell on November 6, 2018, nor does he contest the fact that he needed to be handcuffed during transfer. (*See* Dkt. 76 at 4.) While Braun claims that he merely lurched forward when officers were attempting to handcuff him because he slipped on a packet of butter (Dkt. 76 at 4), the video of the incident does not support this assertion. Indeed, the video supports the Defendants' declarations that Braun swung at officers through the book slot as they attempted to handcuff him for transfer and was combative. (*See* Dkt. 111-2; Dkt. 111-3.) Instead of complying with his restraint and perhaps thereby diffusing the need for the application of force, he exacerbated the security risk by attempting to assault officers. The surveillance video supports the accounts from the officers. As such, the Court finds that the application of force against Braun was necessary. *See Jackson*, 866 F.3d at 974; *see generally*, *Scott v. Harris*, 550 U.S. 372, 378-81 (2007) (finding that in ruling on summary judgment, a court should view facts in the light depicted by video that captured the events); *Wallingford v. Olson*, 592 F.3d 888, 892 (8th Cir. 2010) (same).

---

[6]    Regardless of the number of officers involved, the amount of force used based on the situation is the relevant inquiry.

While the parties dispute who attempted to trip whom going down the stairs as part of Braun's cell transfer,[7] the video shows that when officers took Braun to the ground on the landing and asked him why he is trying to fight them, he did not deny this and instead replied, "Why are you violating my rights?" (Dkt. 111-3 at 1:06-09.)

Given Braun's combative nature and his attempts to assault officers, the Court also finds that his restraint until officers could safely exit the cell Braun was ultimately transferred to necessitated the application of force.

With respect to the relationship between the need and the amount of force that was used, the Court finds that the undisputed evidence also supports a finding that Defendants did not maliciously and sadistically apply force to Braun to cause harm. As set forth above, as it relates to the Court's analysis regarding the need for force in the first place, officers were confronted with an inmate who indicated that he was not going to be secured unless he was physically forced to by correction officers. Given the threat posed to the security of MCF-Faribault and the safety of officers, the Court finds that the amount of force applied to Braun was necessary to restore order and not meant to maliciously and sadistically cause harm. It was clear from the video that Braun attempted to assault officers when they attempted to restrain him for transfer and that he continued to refuse to comply. Even though officers sprayed Braun with a chemical irritant, and physical force (joint manipulation) was utilized to restrain Braun's hands

---

[7]    The Court notes that Captain Bob Mallery, Corrections Security Captain, as part of a review of the incident noted that Braun tried to pull away from officers. (Dkt. 111-1 at 13.) Meemken also noted that Braun pulled away and lunged at Sergeant DeMars, trying to trip or otherwise injure DeMars. (Dkt. 117 ¶ 5.)

prior to the entry into his cell for transfer, it cannot be argued in light of the undisputed facts that such force was not applied in good faith to gain compliance and control over this defiant and combative inmate. *See Jones v. Shields*, 207 F.3d 491, 492-95 (8th Cir. 2000) (finding that the use of pepper spray was reasonable under the circumstances where a correctional officer deployed pepper spray on an inmate who refused to cooperate with direct orders; became loud, argumentative, and profane; and advanced towards the officer); *Wickner v. Bender*, No. 12-CV-1452 (DWF/HB), 2019 WL 7562613, at *6 (D. Minn. Dec. 5, 2019) ("Under these standards, Defendants' initial application of chemical irritant on Plaintiff following continued resistance and his sudden movement with the nearby cart was reasonable."), *R.&R. adopted*, 2020 WL 128577 (D. Minn. Jan. 10, 2020); *Graves v. Rivera*, No. 1:CV-14-1266, 2016 WL 740816, at *3 (M.D. Pa. Feb. 25, 2016) (joint manipulation and use of irritant spray found appropriate to gain control of combative inmate).

Similarly, the pinning of Braun to the floor on the landing between the stairs was not excessive. Braun was not thrown down the stairs as he claims (Dkt. 111-3 at 00:31-:39), and soon after he was pinned to the floor, officers asked him if was going to cooperate and get up, at which point he states that he would and was then lifted back to his feet and was able to walk on his own. (*Id.* at 0:39-1:27.) Ensuring that Braun cooperated with guards, given that he was fighting with the officers, was not excessive in light of the dangers posed by escorting an unruly inmate down a metal flight of stairs.

As for the force applied to Braun in the transferred cell, it is important to note that he was placed onto a mattress instead of on the bare floor, he received access to medical

attention, as soon as he cooperated he was allowed to lie on his side, prison guards asked

how Braun was doing while they awaited Health Services, and his chains were examined

for tightness on at least two separate occasions.  The video shows the guards primarily

placing their hands on him, rather than striking him.  While Braun asserts that he asked

one of the officers to get off his ankles and the officer responded by "torqueing" his

ankles (Dkt. 76 at 6), the Court did not observe any such request from Braun during the

video, and he made no complaint to Health Services as to any pain in his legs or ankles or

actions taken against him with respect to his ankles.  *See Mosley v. City of Northwoods*,

415 F.3d 908, 910 (8th Cir. 2005) (stating that a nonmovant may not merely rely on

allegations or denials); *see also Reed v. City of St. Charles*, 561 F.3d 788, 790-91 (8th

Cir. 2009) (finding that party opposing a properly supported motion for summary

judgment "may not merely point to unsupported self-serving allegations, but must

substantiate his allegations with sufficient probative evidence that would permit a finding

in his favor, without resort to speculation, conjecture, or fantasy") (cleaned up and

citations omitted).

In sum, not every "malevolent touch" by a prison guard gives rise to an Eighth

Amendment claim.  *See Hudson*, 503 U.S. at 9.  The application of force is not

determinative, as "'only **the unnecessary and wanton** infliction of pain constitutes cruel

and unusual punishment forbidden by the Eighth Amendment.'"  *Jackson*, 866 F.3d at

974 (emphasis added) (quoting *Whitley*, 475 U.S. at 319); *see also Ward v. Smith*, 844

F.3d 717, 721 (8th Cir. 2016) ("Because the use of force is sometimes required in prison

settings, guards are liable only if they are completely unjustified in using force, i.e., they

are using it maliciously and sadistically.") (quotation marks and citation omitted).  Given that Braun attempted to assault prison guards and was combative during his transfer, the Court does not find that the force used in attempting to neutralize the threat posed by Braun was completely unjustified even if "superior alternatives" were available.  *See Jackson*, 866 F.3d at 974-75; *see also Johnson v. Hamilton*, 452 F.3d 967, 970-972 (8th Cir. 2006) (affirming summary judgment dismissing prisoner's excessive force claim when prison employees physically restrained and punched a prisoner who pushed and punched one of the employees).  In sum, the Court finds that an appropriate level of force to subdue Braun and restore order was used and not undertaken "maliciously and sadistically for the very purpose of causing harm."  *See Whitley*, 475 U.S. at 320-21.

Finally, the Court finds that the undisputed evidence is that Braun suffered no long-term physical harm as the result of the November 2018 incident.  The Supreme Court has made clear that the focus in an excessive force claim is on the quantum of force used and not the injury sustained.  *See Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010).  The extent of injury, however, "provides some indication of the amount of force applied" and is a "factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation."  *Id.* (quotation marks and citations omitted); *see also Jackson*, 866 F.3d at 974.  Here, Braun asserts that he is taking medication for nerve damage related to the injuries he suffered.  However, there is no evidence in the medical record that he suffered any nerve damage as a result of the incident, only that he suffered from migraines and was weaned off of a medication due to a drug interaction.  (Dkt. 121 at 3.)  Similarly, Braun relies on the x-ray of his lumbar spine; however, the x-ray

contradicts Braun's excessive force claims, as there was no evidence of fracture or dislocation, only "minimal degenerative spondylosis of the lumbar spine," which could be merely due to age.[8]  In sum, Braun offered no evidence that Defendants' actions resulted in nerve damage or any condition relation to his lumbar spine.  *See Robinson v. Hager*, 292 F.3d 560, 564 (8th Cir. 2002) (requiring proof of causation for injuries).  The Court acknowledges that Braun was subjected to a chemical irritant and suffered abrasions on his face and marks related to his restraint.  However, such minor and temporary injuries, given Braun's combativeness, do not afford him relief.  *See*, *e.g.*, *Ellison v. Lesher*, 796 F.3d 910, 917 (8th Cir. 2015) (citing *Ziesmer v. Hagen*, 785 F.3d 1233, 1236-37 (8th Cir. 2015)) ("Our cases characterize relatively minor scrapes, bruises, and contusions as de minimis."); *Peterson v. Kopp*, 754 F.3d 594, 601 (8th Cir. 2014) ("And here, Peterson has not presented evidence that the pepper spray caused more than temporary pain and discomfort; though a close case, we do not think this constitutes more than de minimis injury."); *Foster v. Phinney*, No. 19-CV-260 (JNE/ECW), 2021 WL 1321346, at *14 (D. Minn. Jan. 20, 2021) ("Courts within this District have concluded that in cases like these, where a plaintiff alleges that officials applied handcuffs too tightly and then ignored the plaintiff's complaints of pain, there must be some proof, usually in the way of medical records, showing the plaintiff suffered long-term injury as a

---

[8]    Braun claims that he was not afforded any x-rays for over a year, and never received one for his wrist.  (Dkt. 120 at 3.)  However, there is no evidence in the record suggesting that x-rays were necessary or that he even requested x-rays around the time of the November 2018 incident.

result of the handcuffing.") (citations and marks omitted), *R.&R. adopted*, 2021 WL 838738 (D. Minn. Mar. 5, 2021).

In sum, the totality of the undisputed evidence demonstrates that Defendants' decisions and actions were applied in a good-faith effort to maintain or restore discipline and were not done maliciously and sadistically in order to cause Braun harm. Therefore, summary judgment as to the excessive force claim should be granted.

**B.    Deliberate Indifference to Serious Medical Needs**

The Eighth Amendment prohibits deliberate indifference to serious medical needs—i.e., a serious illness or injury—of prisoners. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). Deliberate indifference is manifested by prison medical staff "in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.*; *Weaver v. Clarke*, 45 F.3d 1253, 1255 (8th Cir. 1995) ("[A] prison official violates the Eighth Amendment by being deliberately indifferent either to a prisoner's existing serious medical needs or to conditions posing a substantial risk of serious future harm.").

The deliberate indifference standard has an objective and subjective prong. *Saylor v. Nebraska*, 812 F.3d 637, 644 (8th Cir. 2016). "The plaintiff must prove 'that he suffered from an objectively serious medical need' and 'that Defendants actually knew of but deliberately disregarded his serious medical need.'" *Id.* (quoting *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 529 (8th Cir. 2009)). "A medical condition is 'objectively serious' if the prisoner was diagnosed by a doctor or it is so obvious that a lay person would recognize the medical need." *Saylor*, 812 F.3d at 644. "The subjective prong of

deliberate indifference is an extremely high standard that requires a mental state of more than gross negligence," requiring a "mental state akin to criminal recklessness." *Id.* (citations and quotations omitted); *see also Nelson*, 583 F.3d at 529 (finding that a showing must be made that a defendant "acted maliciously for the purpose of causing him harm"). Thus, the relevant questions here are whether (1) Braun "had [a] serious medical need or whether a substantial risk to h[is] health or safety existed, and (2) whether [Defendants] had knowledge of such serious medical need or substantial risk to [Braun's] health or safety but nevertheless disregarded it." *Nelson*, 583 F.3d at 529.

Defendants argue that Braun's deliberate indifference claim fails in part because he cannot show that he had a serious medical need. (Dkt. 105 at 19.) Specifically, Defendants assert that while Braun claims that his shoulder was dislocated, there is no evidence that Braun was ever diagnosed with a dislocated shoulder, nor did the nurse assessing Braun note any other concerns that required immediate medical attention, including any trauma that required a therapist. (*Id.* at 19-20.) Defendants also note that Braun had the opportunity for a registered nurse to assess him on November 7, 2018, but he refused. (*Id.* at 20.) Further, Defendants argue that there was no deliberate indifference to his medical needs, asserting that he received medical services, he had the opportunity for follow-up care that he refused (including an assessment by a registered nurse the following day and the opportunity to speak with Sunde in his capacity as a CIT), and there was no evidence that he was deprived of food and water. (*Id.* at 21-22.)

Braun counters that he suffered from visible scarring as the result of being thrown down the stairs by guards, and the reason why there was no evidence of a broken wrist or

an injury to his back was that Defendants refused to perform an x-ray until almost a year after the incident and then only imaged his back. (Dkt. 120 at 3.) Braun also asserts that he was denied his therapist, as he was not allowed to have any visitors while he was in Quiet Status after the incident. (*Id.* at 4.) Braun also argues that Defendants showed deliberate indifference to his medical needs by ignoring his hunger strike. (Dkt. 120 at 3.)

Here, the video shows that Braun was provided access to and requested to be seen by Health Services during the incident at issue. Health Services made the determination at that time that Braun was not suffering from any serious medical need, given that he was talking, breathing, and moving around, but would stand by just in case. Braun complains that Defendants ignored his bleeding, leading to scarring on his face. (Dkt. 76 at 6.) While photographs show an abrasion on his temple, as well as marks and abrasions on his extremities (Dkt. 121 at 5-10), such injuries do not amount to Braun suffering from an "objectively serious medical need." *See Beane v. Hennepin Cnty. Jail*, No. CIV. 15-205 DWF/BRT, 2015 WL 4545374, at *3 (D. Minn. July 27, 2015) *(*quoting *Laganiere v. Cnty. of Olmsted*, 772 F.3d 1114, 1116 (8th Cir. 2014)) ("[U]nadorned references to a cut on his lower area are not sufficient to establish that he suffered from an 'objectively serious medical need,' one that 'has been diagnosed by a physician as requiring treatment, or is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'"); *see also Howard v. Jones*, No. 2:10CV00158 JLH/BD, 2012 WL 602641, at *4 (E.D. Ark. Jan. 24, 2012) (granting summary judgement on a deliberate indifference claim and finding that "Mr. Howard claims that any open wound is a serious

injury and that the cut to his head could have endangered his life or could have resulted in

a concussion," "[h]owever, he was never diagnosed with a concussion, and he does not

allege any lasting effects from a delay in treatment"), *R.&R. adopted*, 2012 WL 601229

(E.D. Ark. Feb. 23, 2012).  Braun provided this Court with no evidence of any plausible

lasting effects related to his abrasions or restraints, including any photographs of his

claimed scarring.  The same goes for claims related to being exposed to a chemical

irritant.

Braun also claims that imaging of his back proves deliberate disregard and that

had Defendants performed imaging earlier, they would have seen more injuries to his

back and wrists that they chose to ignore.  However, as the Court found earlier, Braun

showed no proof of any injury to his back stemming from the incident, let alone any

injury to his wrists.  Braun's assertion of speculative injuries is to no avail.  Moreover,

had Braun seen a nurse after the incident, he could have made complaints of pain that

may have led to x-rays, but he chose not to see a nurse.  (Dkt. 107 ¶ 7; Dkt. 108)  Braun

cannot legitimately assert that Defendants disregarded his serious medical needs when he

refused medical care.  His self-serving assertions in his brief that he was too weak to

complain because of a hunger strike (Dkt. 120 at 2-3) do not defeat Defendants' motion

for summary judgment.  *See Davidson & Assocs. v. Jung*, 422 F.3d 630, 638 (8th Cir.

2005) ("A plaintiff may not merely point to unsupported self-serving allegations, but

must substantiate allegations with sufficient probative evidence that would permit a

finding in the plaintiff's favor."); *T Mason v. White Castle Sys., Inc.*, No. CIV. 09-208

RHK/FLN, 2009 WL 1456945, at *3 (D. Minn. May 22, 2009) ("Mason cannot defeat

summary judgment with her attorney's unsupported factual allegations contained in the opposing memorandum.").

The same is true of his claims that he was denied a therapist. There is no evidence of him requesting psychological services and being denied those services or that this resulted in any harm to him, especially when he received a psychological referral as of November 8, 2018, two days after the incident that gave rise to this lawsuit (Dkt. 108). *See Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8th Cir. 1997) (affirming summary judgment when inmate failed to submit verifying medical evidence that prison officials' delay had an adverse effect). The only request from Braun at MCF-Faribault was to speak with a CIT member, and even when he had a chance to speak to one, he only complained about his legal paperwork. (Dkt. 110 ¶ 12.)

Braun also claims deliberate indifference with respect to his hunger strike. Even assuming that Defendants knew about the hunger strike, Braun does not assert what harm he suffered as a result of Defendants' purported failure to act, and since he "has failed to present any evidence that he was actually in need of medical or mental health treatment during the hunger strike, . . . his deliberate indifference claim fails as a matter of law." *Collins v. Burl*, No. 2:11-CV-40-DPM-BD, 2013 WL 6195748, at *4 (E.D. Ark. Nov. 26, 2013); *see also Crowley*, 109 F.3d at 502 (affirming summary judgment when inmate failed to submit verifying medical evidence he was actually in need of medical or mental health treatment during his hunger strike). To the extent that it is Braun's position that Defendants' indifference is proven by the fact that they did not follow DOC policy (*see* Dkt. 76), the failure to follow a prison policy or protocol falls short of stating a

constitutional claim. *See Braun v. Walz*, No. CV 20-333 (DSD/BRT), 2021 WL 268321, at *7 (D. Minn. Jan. 27, 2021) (citing *Gardner v. Howard*, 109 F.3d 427, 430 (8th Cir. 1997)) ("The key question here is whether Defendants can be liable to Braun merely for violating MNDOC policy. This Court concludes that they cannot. With respect to liability under 42 U.S.C. § 1983, no such liability exists based merely on prison officials' failure to follow applicable prison policies."), *R.&R. adopted*, 2021 WL 1171693 (D. Minn. Mar. 29, 2021).

For all of these reasons, the Court finds that when taking the available competent evidence in the light most favorable to Braun, no reasonable juror could find that Defendants' actions constituted deliberate indifference and summary judgment should be granted as to this claim.

## V.    RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** as follows:

1.    Defendants' Motion for Summary Judgment (Dkt. 104) be **GRANTED**.

2.    Plaintiff's Amended Complaint be **DISMISSED WITH PREJUDICE**.

Date: July 14, 2021                         *s/Elizabeth Cowan Wright*
                                            ELIZABETH COWAN WRIGHT
                                            United States Magistrate Judge

## **NOTICE**

**Filings Objections:** This Report and Recommendation is not an order or judgement of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).